IN THE CIRCUIT COURT OF THE
FIRST JUDICIAL CIRCUIT, IN
AND FOR OKALOOSA COUNTY,
FLORIDA

LESLIE SMITH,

Plaintiff,

v.

CASE NO.: 07-CA-73-S-YB
CIVIL DIVISION

PSYCHIATRIC SOLUTIONS, INC.,

PREMIER BEHAVIORAL SOLUTIONS, INC.,

and

GULF COAST YOUTH ACADEMY,

Defendants.
_____/



## COMPLAINT

1. This action is brought pursuant to the Florida Private Whistleblower Act, §§ 448.101-105, Florida Statutes, and the Florida Public Whistleblower Act, §§ 112.3187-112.31895, Florida Statues.

2. Plaintiff Leslie Smith (hereinafter "Plaintiff") is a U.S. citizen and a resident of Okaloosa County, Florida.

3. Defendant Psychiatric Solutions, Inc. (hereinafter "Defendant PSI") is a Florida corporation that operates private inpatient psychiatric facilities.

4. Defendant PSI is a corporation authorized to do business in Florida.

5. Defendant Premier Behavioral Solutions, Inc. (hereinafter "Defendant PBS") is a Florida company that provides services through contracts with state and local government agencies.

EXHIBIT 1

6. Defendant Gulf Coast Youth Academy (hereinafter "Defendant GCYA") is a treatment facility for youth offenders in Ft. Walton, Okaloosa County, Florida.

7. Defendant GCYA is owned an operated by Defendant PBS.

8. Defendant PBS is a subsidiary of Defendant PSI.

## GENERAL ALLEGATIONS

9. Defendant GCYA is a medium security juvenile correction program for delinquent youth.

10. Defendant GYCA is licensed by the Department of Children and Families (DCF) as an outpatient substance abuse facility.

11. The youth assigned to the facility are court-ordered, usually completing the program in 6-9 months.

12. On January 10, 2006, Plaintiff was hired by Gulf Coast Youth Academy (GCYA) as a Masters Level Therapist to provide individual and group mental health services to juvenile males.

13. Defendant GCYA is a no-touch facility, which means that staff will not place their hands on the youth except as a last resort to detain an out-of-control juvenile when all attempts of de-escalation have failed.

14. The policy and procedure for de-escalation is outlined in specific and clear language.

15. The steps to de-escalation are taught to each youth care worker and are posted throughout the facility.

16. When detainment is necessary, staff must comply with specific procedures referred to as Operation PAR.

17. Operation PAR is a set of rules to protect all information about youth offenders that would allow them to be identified as someone who received substance abuse treatment or services.

18. PAR guidelines explain when the youth's personal information can legally be shared, what privacy rights the youth have, how they can complain and what records they have access to.

19. All youth care staff must be PAR certified prior to working with the youth in the facility.

20. All youth care staff are trained regarding the youths' rights to file grievances and make abuse calls without interference.

21. GCYA requires that all physical interventions with youth are audio/video taped by staff with a hand held recorder to ensure that de-escalation and PAR guidelines are followed accordingly.

22. With few exceptions, all activities in all areas of the facility are captured on stationary surveillance cameras.

23. Defendant GCYA must follow child abuse reporting procedures.

24. Youth are to have unimpeded access to report alleged incidences of abuse to the Florida Abuse Hotline.

25. The Department of Juvenile Justice's Central Communication Center (CCC) is to be notified within two hours of the incident of abuse.

26. Any staff person who has knowledge about incidents of physical violence or other abuse must report the conduct to the Florida Department of Children and Families.

27. From the beginning of Plaintiff's employment to the day she was fired, she reported incidents of physical abuse to the Department of Children and Families and the Florida Department of Juvenile Justice.

28. Plaintiff also reported instances of Medicaid fraud to Defendant PSI.

### I.   GCYA STAFF

29. The CEO of Defendant GCYA is Jeff Kaplan.

30. Kaplan hired two employees who received Dishonorable Discharges from the United States Air Force.

31. The Assistant Program Director, Charleton Eric Esmond was discharged from the military for sexual harassment and sexual misconduct.

32. Esmond was promoted to GCYA Program Director shortly after Plaintiff was terminated.

33. The GCYA Assistant Program Director, Stephens, was discharged from the military for issues related to illegal drugs.

34. The BHOS (Behavioral Health Overlay Services) Program Director was Howland Ellis.

35. Ellis is directly accountable for therapeutic Medicaid Services provided to residential youth at all of the Gulf Coast Youth Services facilities.

36. Plaintiff's direct supervisor was BHOS Clinical Director and Licensed Clinical Therapist Kim Hughes.

### II.   PROTECTED ACTIVITY

#### A.   PLAINTIFF REPORTED SEXUAL ABSUE

37. In February 2006, Plaintiff learned that a youth (hereinafter "victim") was being continually sexually abused by another youth.

38. On or about February 23, 2006 Plaintiff reported the activity to Program Director Howland Ellis and the facility's Licensed Therapist, Kim Hughes.

39. Plaintiff told Hughes and Ellis that she was concerned that the offender would continue to single out potential victims in the program with lower-functioning abilities in order to gain sexual favors.

40. Defendant GYCA failed to follow DJJ policy to report the offender as a sexual offender to DJJ, file charges against him, place him on ALERT Status and remove him from the general population.

41. On March 23, 2006, Control Room staff Augusto told Plaintiff that the victim told her he was tired of having to masturbate every night in front of the offender and ejaculate on his face.

42. According to Augusto, the victim informed staff that he would stand beside the offender's bed at night and masturbate while he watched.

43. Augusto stated that the victim informed the staff he was "getting very tired of having to do it."

44. Augusto stated that after the interview with the victim she and other staff retrieved the video footage of the incident in question and found the victim's statements to be true.

45. Augusto told Plaintiff "there it was, just like [he] said. You could see everything."

46. According to Augusto, the victim was observed on video tape standing beside the offender's bed, masturbating for a period of time and ejaculating on the offender's face.

47. Augusto told Plaintiff that she remembered the date distinctly because it was February 14, 2006, Valentine's Day and that some of the staff found the correlation between the incident and Valentine's Day to be humorous.

### B. PLAINTIFF REPORTED EXCESSIVE USE OF FORCE

48. On or about March 17, 2006 Plaintiff reported an incident of physical abuse involving another youth and GCYA staff.

49. The youth told Plaintiff he was held by staff, hit repeatedly by a peer, handcuffed behind the back, shackled at the ankles, dragged by the collar of his jumper, thrown in the confinement room, received an injury to his shoulder, left unattended in mechanical restraints in locked confinement for hours, then left in isolation confinement overnight.

50. The youth was advised by GCYA staff not to discuss the abuse with the DCF investigator.

51. The youth's case manager asked therapist to withhold calls to the youth's mother unless case manager was present to monitor his calls.

52. The youth reported he was hit by a peer and staff failed to assist or intervene.

53. The youth reported a staff entered his bedroom and hit him in the stomach/ribs.

54. The youth reported that other youth were present and witnessed the event.

55. The youth reported he was not allowed by staff to call DCF to report the abusive incident.

C. **PLAINTIFF REFUSED TO DISREGARD REPORTING GUIDELINES**

56. On March 21, 2006 there was a meeting where the therapists, including Plaintiff, were strongly encouraged not to report incidents of abuse to DCF.

57. Program Director Howland Ellis outlined a change in the reporting procedure.

58. Therapist will notify the program director prior to reporting an allegation of child abuse to DCF.

59. Ellis said the purpose of the policy change was to:

   a) give the Director the "courtesy" of knowing the situation;

   b) delay the therapist's call to DCF (3 hour window) for the purpose of an initial internal investigation by GCYA Administration regarding the youth's complaint;

   c) allow the Director or other staff opportunity to discuss the issues with the youth prior to an investigation by DCF;

   d) determine allegation legitimacy and to support their internal investigation;

   e) be able to warrant disciplinary actions against another youth or staff in violation of program rules or regulations.

60. Ellis told Plaintiff and the other therapists that if the youth made an abuse allegation to therapists that resulted from an altercation with staff or another youth, the therapist was not allowed to:

   a) assume the role of investigator in an manner;

   b) ask to review security tapes regarding the alleged incident;

   c) ask questions or solicit information from other youth regarding the incident such as who was involved, what was discussed, or who witnessed the event;

   d) ask reporting youth questions regarding the incident, even if youth is assigned to therapist case load.

61. On March 25, 2006 Plaintiff faxed a letter to DCF reporting the physical abuse of a youth involving another youth and GCYA staff, GCYA staff advising a youth not to discuss abuse with DCF Investigator, and attempts by BHOS Director to interfere with abuse reporting protocol.

62. Because of the confidential protection offered mandatory reporters, it is not mandated that a therapist advise other parties when a call is initiated to the abuse hotline on behalf of a youth at the GCYA facility.

63. Additionally, all communication between a therapist and her client falls under therapeutic privilege and does not have to be discussed with administration.

64. Plaintiff's knowledge of state law was that therapists are mandatory reporters of suspected child abuse, and their reports are confidential.

65. Plaintiff reported the abuse to DCF and DJJ on 03/17/06, 03/22/06, 03/23/06, 03/24/06 and 05/01/06.

66. On or about March 22, 2006, Plaintiff asked Esmond about the incident of abuse involving the youth reporting the abuse by another youth and the GCYA staff.

67. Shortly after her conversation with Esmond, Plaintiff found out that Esmond kicked another youth.

68. The youth told Plaintiff that he was jacked-up, slammed into a wall, and slammed into several locked doors by Mr. Esmond.

69. The youth told Plaintiff he was placed in the isolated confinement room for hours following the assault and denied repeated requests to place a call to the DCF abuse hotline to report the incident.

70. On or about March 29, 2006 Plaintiff reported the assault to DCF.

71. Plaintiff ran group therapy sessions with the youth.

72. During one group therapy session, another youth reported that staff threatened to physically hit him in the throat or chest if he continued to ask for grievance forms or ask to make abuse calls.

73. The youth told Plaintiff the staff refused to help him obtain needed hygiene items.

74. The youth told Plaintiff he was denied several requests to file grievances.

75. On or about March 30, 2006 Plaintiff reported the incidents to Howland Ellis, Eric Edmond and Duane Evans.

### D. PLAINTIFF REPORTED MEDICAID FRAUD

76. Kim Hughes, the current BHOS Clinical Supervisor and Licensed Clinical Therapist, was responsible for training and supervising the five non-licensed therapists at Defendant GYCA, including Plaintiff.

9

77. Because of on-going problems at another facility, Okaloosa Youth Academy (OYA), Hughes was also supervising therapists at that facility and rarely available at the GCYA facility for consultation.

78. Hughes split her time between Defendant GCYA and OYA, which resulted in late signing of critical documents.

79. Many documents were back-dated by Hughes due to her unavailability, and returned to therapists as much as three weeks late; as a result, clinical charts were routinely incomplete.

80. On several occasions, Hughes instructed therapists to sign meeting, training, and supervision documents in the absence of such activities in order to support Medicaid billing criteria.

81. Hughes asks therapists to sign documents verifying that she supervised them on-site, even though she could not have been supervising therapists at OYA and GYCA simultaneously.

82. On or about April 7, 2006, Plaintiff was asked to sign "supervisor / training" log when she was not supervised by Hughes.

83. Plaintiff initially refused to sign the document indicating that she had been supervised by Hughes.

84. Hughes insisted that Plaintiff sign, leading Plaintiff to believe the document was unrelated to direct supervision.

85. On or about April 8, 2006, Plaintiff learned that on two occasions a youth was denied the grievance process.

86. Plaintiff told Evans, Esmond, and Ellis that the youth was denied the opportunity to go through the grievance procedure.

87. On or about April 12, 2006, after the youth had still not been able to file a grievance, Plaintiff reported it to DJJ and DCF by telephone.

### E. PLAINTIFF REPORTED FALSIFIED DOCUMENTS

88. In April of 2006, a youth told Plaintiff he had refused to take his medications.

89. Although it is usually in the youth's best interest to take medication, and the youth is encouraged by staff and therapists to comply with the doctor's orders, there remains an issue as to whether a youth can be sanctioned and denied privileges for refusing to take his medication.

90. Plaintiff reviewed the youth's medical records and discovered that he had refused his medications on 01/30/06, 03/12/06, 03/27/06, 03/29/06 and 04/07/06.

91. The youth was punished for refusing to take his medications: he was placed in locked confinement, denied educational services twice and denied routine privileges in the program for his refusal.

92. Plaintiff reported the situation to Ellis, Evans, Esmond, Nurse Riddle, DCF and DJJ DCF and DJJ, noting in her report that there was no indication that the punishments were related to acting-out behaviors warranting his removal from school or placement in isolation.

### III. PROTECTED ACTIVITY CAUSED TERMINATION

93. On or about May 2, 2006, Plaintiff discovered a falsified document after a youth reported he was placed in isolated confinement for refusing to take his medication.

94. The REFUSAL OF MEDICATION document had been altered to look like he agreed to take his medications.

95. The REFUSAL OF MEDICATION document had been altered, omitting the main body of the document, staff comments, dates, and signatures.

96. Plaintiff was escorted from the GCYA premises after being questioned for reporting the finding of the altered REFUSAL OF MEDICATION document.

97. In the months preceding the incident Plaintiff and the other therapists had advised Nurse Riddle, Kim Hughes, Howland Ellis and Duane Evans that the original REFUSAL OF MEDICATION document format violated the youth's civil rights as it stated a youth could be punished for refusing to take medication.

98. Plaintiff was told to immediately leave the building pending the outcome of an investigation regarding the altered document, and told she would be paid for my time while away from work.

99. However, Plaintiff was fired two days later.

100. Plaintiff was not advised that she had been fired for almost two weeks.

101. It was only after Plaintiff contacted Defendant PSI that she was told of her permanent separation.

102. The official letter of dismissal stated that Plaintiff unsuccessfully completed her probation period.

### IV.   OBSTRUCTION OF INVESTIGATIONS

103. Defendants GCYA, PSI and PBS obstruct investigation into allegations of abuse.

104. DCF investigators, as well as Sheriff Department investigators, report difficulty in accessing facility video tapes capturing the reported violations.

105. Defendant GCYA tells outside investigators that the video tapes are not available when they arrive at the facility, or that the video surveillance camera in the area of concern was inoperable at the time of the incident.

106. Defendants GCYA, PSI and PBS temporarily remove staff accused of abusing the youth to make sure they are unavailable for questioning.

107. Many times, especially if injury is incurred by the youth following an altercation with staff, the youth is arrested with allegations of assaulting the staff and removed from the facility.

108. As a result, most investigations conducted by DCF are inconclusive due to the inability to gather sufficient evidence.

109. Plaintiff has found it necessary to retain counsel to vindicate her rights in this matter.

### COUNT I- § 448.101-105, FLA. STAT.
### FLORIDA PRIVATE WHISTLEBLOWER ACT
### RETALIATION

110. Plaintiff realleges Paragraphs 1 through 109.

111. The foregoing actions of Defendants PSI, PBS and GCYA constitute retaliation against Plaintiff in violation of the Florida Private Whistleblower Act, §440.101-105, Fla.Stat.

112. Plaintiff objected to and refused to participate in practices which are in violation of several laws, rules, and regulations.

113. Defendants PSI, PBS and GCYA terminated Plaintiff in retaliation for repeatedly reporting violations of state law, including falsification of documents, excessive use of force and refusal to follow mandatory reporting procedures to state agencies.

114. Plaintiff has suffered damages because of the Defendants actions.

### COUNT II- §§ 112.3187-112.31895, FLA. STAT.
### FLORIDA PUBLIC WHISTLEBLOWER ACT
### RETALIATION

115. Plaintiff realleges Paragraphs 1 through 109.

116. The foregoing actions of Defendants PSI, PBS and GCYA constitute retaliation against Plaintiff in violation of the Florida Public Whistleblower Act, §§ 112.3187-112.31895, Fla.Stat.

117. Defendants PSI, PBS and GCYA have state contracts for the operation of psychiatric facilities.

118. Plaintiff disclosed information about suspected violations of law to state agencies authorized to investigate such violations.

119. Defendants PSI, PBS and GCYA terminated Plaintiff in retaliation for repeatedly reporting violations of state law, including falsification of documents, excessive use of force and refusal to follow mandatory reporting procedures to state agencies.

120. Plaintiff has suffered damages because of the Defendants actions.

### Prayer for Relief

WHEREFORE, Plaintiff prays for the following relief:

(a) that process issue and this Court take jurisdiction over this case;

(b) judgment against Defendants PSI, PBS and GCYA and for Plaintiff, ordering Defendant to reinstate Plaintiff to her former position;

(c) judgment against Defendants PSI, PBS and GCYA and for Plaintiff, awarding compensatory damages against Defendants PSI, PBS and GCYA on each count for Defendants' violations of law enumerated herein;

(d) judgment against Defendants PSI, PBS and GCYA and for Plaintiff, permanently enjoining Defendant from future violations of law enumerated herein and remedying all past and future lost income, raises, and other benefits of which Plaintiff has been unlawfully deprived;

(e) judgment against Defendants PSI, PBS and GCYA and for Plaintiff, awarding Plaintiff her attorneys' fees and costs; and

(f) all equitable relief that is allowed by law.

### Jury Demand

Plaintiff demands trial by jury on all issues so triable.


Respectfully submitted,


*/s/ Andrea L. Reino*
Andrea L. Reino
FL Bar No 427233

Richard E. Johnson
FL Bar No 858323

LAW OFFICES OF RICHARD E. JOHNSON
314 West Jefferson Street

Tallahassee, Florida 32301
Telephone: (850) 425-1997
Facsimile: (850) 561-0836