IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


LESLIE SMITH,
     Plaintiff,

v.                                    Case No.: 3:08cv3/MCR/EMT

PSYCHIATRIC SOLUTIONS, INC., et al.,
     Defendants.
_____/

## SECOND REPORT AND RECOMMENDATION

In its first Report and Recommendation to the district court this court recommended that Plaintiff Leslie Smith ("Plaintiff") be required to pay attorneys' fees under Fla. Stat. § 448.104 to Defendants Psychiatric Solutions, Inc. ("PSI"), Premier Behavioral Solutions, Inc. ("PBS"), and Gulf Coast Treatment Center, Inc. ("GCTC") (collectively, "Defendants") (doc. 309).  This court further recommended that Defendants be awarded attorneys' fees which were incurred opposing Plaintiff's unsuccessful motion under Rule 11 of the Federal Rules of Civil Procedure (*id.*).  The district court adopted these recommendations (doc. 318).  The matter is now before this court to enter a Second Report and Recommendation as to the amount of attorneys' fees to be awarded.  As explained below, the court recommends that Plaintiff be directed to pay Defendants attorneys' fees in the amount of **$53,925.98** and that Plaintiff's counsel Richard Johnson ("Johnson") be directed to pay Defendants attorneys' fees in the amount of **$5,338.20**.

### BACKGROUND

A more detailed recitation of the early, and lengthy, history of this action is given in the first Report and Recommendation (doc. 309), and it need not be repeated here.  In short, Plaintiff was a therapist who worked for fewer than four months in 2006 at a treatment center operated by GCTC[1]

---

[1]  At the time summary judgment was entered in 2009, GCTC was owned by PBS, which in turn was owned by PSI. According to Plaintiff, Universal Health Services ("UHS") bought the defendant companies in 2010 for $2 billion (*see* doc. 339 at 5).

that offered a program for juvenile delinquents court-ordered to attend. Plaintiff contended that while working at the treatment center she uncovered evidence of Medicaid fraud, abuse, and forcible medication of a juvenile patient and that her reporting the third matter led to her firing. Plaintiff initiated suit in state court, with Defendants removing the case to this forum after the state court granted Plaintiff leave to amend her complaint to include a claim under the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514(A). An extensive and highly contentious period of discovery ensued. At summary judgment, the district court ruled in Defendants' favor on Plaintiff's SOX claim and her claim under the Florida Private Whistleblower Act ("FWA"), Fla. Stat. §§ 448.101, *et seq.* (*see* doc. 150). On appeal, the Eleventh Circuit Court of Appeals affirmed the district court's rulings (*see* doc. 213). Plaintiff filed a petition for writ of certiorari, which the Supreme Court denied (*see* doc. 237). Following the district court's adoption of the undersigned's first Report and Recommendation, Defendants filed affidavits and other papers in support of their motion for fees in accordance with N.D. Fla. Loc. R. 54.1(E) (docs. 325, 326), and Plaintiff responded (doc. 339). As directed by this court, Defendants have also filed a reply to Plaintiff's response (doc. 349).

## DISCUSSION

The lodestar method is used to determine the reasonableness of attorneys' fees. This method is "properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." Blum v. Stenson, 465 U.S. 886, 888, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984); *see also* Norman v. Hous. Auth. of City of Montgomery, 836 F.2d 1292, 1299 (11th Cir. 1988). A reasonable hourly rate is based upon "'the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation.'" Duckworth v. Whisenant, 97 F.3d 1393, 1396 (11th Cir. 1996) (quoting Norman, 836 F.2d at 1299)).[2] In calculating the number of hours which were reasonably expended on the

---

[2] To aid in the determination of an attorney's reasonable hourly rate, the court may also consider, to the extent relevant, the factors set out in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974). The Johnson factors include: (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the degree of skill necessary to serve the client properly, (4) the attorney's inability to accept other employment because he accepted the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount of damages involved and the relief or results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the attorney's professional relationship with the client, and (12) awards in similar cases. *Id.* at 717. The going rate in the community, however, is the most critical factor in setting the fee rate. Martin v. University of South Alabama, 911 F.2d 604, 610 (11th Cir. 1990).

litigation, the court should exclude excessive, unnecessary, and redundant hours, and it should also exclude the time spent litigating "discrete and unsuccessful claims." Duckworth, 97 F.3d at 1397. "The fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates." Norman, 836 F.2d at 1303. With respect to rates, an applicant may meet its burden by producing either direct evidence of rates charged under similar circumstances or opinion evidence of reasonable rates. *Id.* at 1299. In addition, the Eleventh Circuit has noted that "the court . . . is itself an expert on the question [of attorneys' fees] and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Id.* at 1303 (quotation and citation omitted). Local Rule 54.1 of the Northern District of Florida outlines the procedure to be followed with respect to motions for attorneys' fees. Local Rule 54.1(B), Attorneys' Fees Records, provides in relevant part:

> In any proceeding in which any party is seeking an award of attorneys' fees from the opposing party pursuant to any statute, contract, or law, the party seeking such an award of attorneys' fees shall:
>
> > (1) Maintain a complete, separate, and accurate record of time (to the nearest 1/10 of an hour) devoted to the particular action, recorded contemporaneously with the time expended, for each attorney and each specific activity involved in the action (i.e., not just "research" or "conference"); and
> >
> > (2) File electronically a summary of such time record with the clerk by the fifteenth (15th) day of each month during the pendency of the action, for work done during the preceding month.
> >
> > * * * *
> >
> > (5) Failure to comply with these requirements will result in attorneys' fees being disallowed for the omitted period.

N.D. Fla. Loc. R. 54.1(B).

Additionally, Local Rule 54.1(E) provides that where the court has awarded fees, the party awarded such fees shall file "an affidavit setting out the requested amount and specifically describing the requested rate of compensation and the numbers of hours spent in the prosecution

> or defense of the case as are reflected in the monthly reports filed with this court,
>
> with sufficient detail to identify the exact nature of the work performed." N.D. Fla.

Loc. R. 54.1(E)(1). In support of its claim, the party awarded fees is also required "to file and serve a supporting affidavit from an attorney, familiar with the area of law involved, that the requested rate for hourly compensation is in line with the prevailing market rate for the work performed." N.D. Fla. Loc. R. 54(E)(3). Within fourteen (14) days after service of these affidavits, the parties against whom the fees and costs are being sought "shall file and serve an acceptance or rejection of the amount being claimed . . . ." N.D. Fla. Loc. R. 54(E)(4).

**1.      Fees Pursuant to Florida Statute § 448.104**

Defendants have supplied the May 11, 2012, affidavit of Mark W. Peters ("Peters"), a partner in the firm of Waller Lansden Dortch & Davis, LLP, who served as Defendants' lead counsel for the duration of this case (doc. 325). In his affidavit Peters describes the nature of the services performed by the attorneys and paralegals who worked on the case, and he provides information concerning their professional backgrounds (doc. 325).[3] Peters states that the total fee amount incurred by Defendants in defending this matter is $289,597.76 (*id.* at 2). This amount is based on hourly rates for Peters ranging from $265.50 to $325.50, for associates/partners from Peters' firm and local counsel from the Keefe, Anchors & Gordon firm ranging from $144.00 to $297.00, and for support staff ranging from $85.00 to $130.50. From the total amount of $289,597.76 incurred, Defendants deduct fees solely related to Plaintiff's SOX claim, as those fees are not reimbursable ($11,574.25); fees related to litigation administration matters ($3,131.86); previously reimbursed fees arising from Plaintiff's earlier-imposed discovery sanctions ($1,470.60); and fees related to Plaintiff's Rule 11 motion which are to be assessed against Plaintiff's counsel ($4,264.05). After these deductions, Defendants state that their request for fees pursuant to § 448.104 is $273,421.05[4] (*id.* at 2–3).

---

[3] Peters attaches to his affidavit a chart outlining the timekeeper's name, number of hours, and hourly rate. The chart lists fourteen timekeepers, but the descriptions of the timekeepers' backgrounds cover only eleven persons; no information concerning the backgrounds of timekeepers "WM with Keefe Anchors," Bill Fiala, and Stephanie Roth is included.

[4] The actual difference between $289,597.76 and $20,440.76 (the latter amount is the sum of $11,574.25, $3,131.86, $1,470.60, and $4,264.05) is $269,157.00. The difference between $273,421.05 and $269,157.00 is $4,264.05—or the amount Defendants seek as a Rule 11 sanction. Therefore, although Peters plainly states that the amount of the Rule 11 sanction ($4,264.05) is to be deducted from the total amount incurred of $289,597.76, it appears his mathematical calculation in fact overlooks that deduction. Plaintiff has not noted, or complained of, what the court considers to be a clerical error. Indeed, Plaintiff likewise relies on the figure of $273,421.05 (*see* doc. 339 at 3).

Defendants have also submitted the May 10, 2012, affidavit of local attorney Ginger Barry Boyd ("Boyd") (doc. 326). Boyd avers that she has litigation experience in labor and employment cases and is familiar with the standards for the award of attorneys' fees in employment litigation, including fees customarily awarded in the Northern District of Florida in such cases. According to Boyd, based on her review of this case, her discussions with Peters, and her professional knowledge and experience, the hourly rates sought for the work performed are within the prevailing market rates for this area and the time expended was reasonable.

Responding, Plaintiff states that "both the time claimed on the tasks recorded and the proposed hourly rates [are] reasonable enough" but that in conferring about the motion the parties agreed to exclude certain charges related to pre-removal and federal appellate proceedings. According to Plaintiff, this results in a new total sought by Defendants of $210,361.65 (doc. 339 at 3). In their reply Defendants agree that this amount—$210,361.65—is the current amount of fees pursuant to § 448.104 which they have agreed to accept, absent any additional reductions that the court may decide to apply (doc. 349 at 7).[5] Given the parties' stated positions, the court accepts the figure of $210,361.65 as the baseline amount of § 448.104 fees Defendants seek from Plaintiff.[6]

As outlined above, there is no dispute in this case concerning the reasonableness of the hourly rates requested. Moreover, based on the above documentation submitted by Defendants the court concludes that the hourly rates are reasonable, a conclusion the court reaches based on the affidavit provided by Boyd as well as its own knowledge and experience concerning local attorneys' fees. *See* Norman, 836 F.2d at 1299, 1303 (court may use its own experience in assessing the reasonableness of attorneys' fees and may form an independent judgment either with or without expert testimony). Additionally, having conducted a cursory review of Defendants' extensive time

---

[5] In addition, Defendants seek another $5,342.29 in expenses related to their demand for § 448.104 fees which they assert have been incurred since filing their fees affidavits (doc. 349 at 8). Defendants ask that the court include that amount in the final award of fees (or, if the court reduces the $210,361.65 request by a specific percentage, that the court reduce the request for $5,342.29 by a like percentage).

[6] Regardless of the reasons or calculations (or miscalculations) by which the parties arrived at the $210,361.65 figure, that is the number which both sides cite as their last point of agreement on the issue of the amount of § 448.104 fees—and the number which Plaintiff has not disputed and on which in fact she has relied in her response. Thus $210,361.65 is the figure the court uses.

records, the court is satisfied there is no need to reduce the number of hours on the basis they are excessive, redundant or otherwise unnecessary.[7] *See id.* at 1301.

While Plaintiff does not dispute the reasonableness of the hourly rates or hours claimed by Defendants, she nevertheless contends that the amount of the § 448.104 attorneys' fees assessed against her should be greatly reduced. Plaintiff asserts that the award should take into account the significant disparity of wealth between herself and Defendants, a factor the court recognized and briefly discussed in its first Report and Recommendation.[8] According to Plaintiff, based on this disparity the court should enter an appealable judgment against her in the amount of $21,000.00 (doc. 339 at 1, 8). Plaintiff outlines the process that leads her to suggest this amount: during fee negotiations on the issue of the parties' disparity of wealth, Plaintiff initially proposed to Defendants an agreed appealable award to them of $46,279.63, an offer derived from Plaintiff's reading of Bush v. Raytheon, 2010 WL 2044887, *2 (M.D. Fla. 2010) ("Raytheon II"). In particular, Plaintiff apparently relies on the Raytheon II court's order which, she says, reduced the Defendant's fee request by a total of 78.4%.[9] In the instant case, a reduction of approximately 78% of $210,361.65 equates to $46,279.63. Defendants, the parties agree, countered Plaintiff's offer with one providing a 25% reduction, resulting in an award of $157,771.24 (*see* doc. 339-1 at 3 and doc. 349 at 3). Plaintiff asserts that after Defendants rejected her offer of $46,279.63 (by making their counter-offer

---

[7] Nor does the court recommend disallowing fees related to several of Defendants' attorney time records that were submitted slightly untimely (*see* docs. 231, 262, 353).

[8] In the first Report and Recommendation the court considered five factors that may be considered in deciding whether an award of fees is appropriate, one of which factors is the parties' wealth disparity. In relevant part the Report stated:

> Although there is little in the record regarding the parties' respective financial circumstances, the court may readily deduce that there is a large disparity in wealth between the corporate Defendants and Plaintiff, an individual now earning approximately $50,000 per year (*see* doc. 278 at 127); *see* Bell [v. Georgia-Pacific Corp.], 2005 WL 1618223, at *1 [M.D. Fla. 2005]. While the court should consider the disparity in wealth between parties to avoid impoverishing an individual or unfairly punishing her for exercising the right to seek legal redress, neither should it penalize a corporation simply because it has greater resources. [Bush v.] Raytheon, 2009 WL 5128040, at *2 [M.D. Fla. 2009 ("Raytheon I")]. The disparity in wealth should not result in refusing to allow any attorneys' fees whatsoever to Defendants. Should fees be awarded, the court may consider the disparity in wealth when setting the amount to be awarded.

Doc. 309 at 25.

[9] By this court's calculation, the total reduction was 68.4%.

of $157,771.24) she was free to seek an even lower amount. Accordingly, now taking a different tack, Plaintiff proposes to assess a fee against her based on a percentage of her annual salary. She again points to Raytheon II, where she notes the plaintiff was ordered to pay what amounted to about 42% of his annual salary of approximately $100,000.00. Here, Plaintiff testified in April 2011 at a hearing on the issue of her liability for fees that her annual salary was $50,000.00, and 42% of $50,000.00 is $21,000.00.[10] According to Plaintiff, this amount accords with the essential principle common to disparity-of-wealth cases, which is to "get the fees down to something the plaintiff can afford to pay" (doc. 339 at 6).

In their reply Defendants provide the following additional information concerning the parties' fee negotiations on the disparity-of-wealth issue. Defendants note that they proposed the $210,361.65 figure on June 12, 2012, in an e-mail from Peters to Johnson (doc. 349). Johnson responded three days later, in part stating that "I think we have agreement on this" and inquiring as to a means of so advising the court (*see* doc. 339-1 at 6). Nine days later, by e-mail dated June 24, 2012, for the first time in the fee negotiations Johnson raised the matter of the parties' widely disparate wealth and suggested the new amount of $46,279.63 (*id.* at 5). Counsel exchanged additional e-mails, with Defendants' ultimately proposing on June 29, 2012, a 25% reduction that would result in an amount due of $157,771.24 (*id.* at 3). According to Defendants, Plaintiff did not respond to that offer but instead on July 12, 2012, filed her response proposing the appealable fee judgment in the amount of $21,000.00. Defendants argue that their proposal to reduce their fees by 25% is reasonable while Plaintiff's proposal to reduce the fees to $21,000.00, or more than 90%, is not.[11] Moreover, according to Defendants, the plain language of § 448.104 does not suggest that an "afford to pay" standard should be applied. Rather, as passed by the Florida legislature, this fee-shifting statute requires the loser to pay, and here Plaintiff is the loser (doc. 349 at 6, 7).

---

[10] As a final matter, Plaintiff states that Defendants have indicated that they intend to pursue collection efforts during the pendency of any appeal, regardless of whether she can afford a supersedeas bond. Should Defendants do so, Plaintiff submits, she would face almost certain financial ruin from "from enforcement of a judgment of $157,771.24," a draconian result that "the case law disfavors" (doc. 339 at 6).

[11] Defendants submit that the largest of the three corporate entities who were parties in this case had annual revenues of less than 10% of corporate giant Raytheon's reported $28 billion. According to Defendants, had they offered a pro rata reduction based "on Raytheon's [proffered] reduction [of 55%], they would have offered a five percent reduction in fees. But Defendants offered to reduce their fees by approximately fifty percent of Raytheon's reduction (twenty-five percent versus fifty-five percent) . . . ." (doc. 349 at 7).

Defendants' annual revenues should not be the determinative factor in deciding the fee the loser should pay.[12] Even if the "afford to pay" standard urged by Plaintiff is what the Florida legislature intended, Defendants maintain, there is no proof of what Plaintiff in this case is actually able to pay, other than Plaintiff's brief testimony at the April 2011 evidentiary hearing. Nevertheless, Defendants submit that if the court should decide to exercise its discretion to apply a reduction based on disparity of wealth, the minimum starting point should be the previously agreed upon amount of $210,361.65 and the reduction should be no more than 25%, resulting in an appealable fee award of $157,771.24 (*id.* at 3, 7).

With the matters of reasonable hourly rates and a reasonable number of hours resolved with respect to § 448.104 attorneys' fees, the court need only address whether the fee award should be reduced based on the parties' disparity of wealth and, if so, by how much. As quoted above in footnote 8, in its first Report and Recommendation the court observed that a significant disparity in wealth obviously existed between the corporate Defendants and Plaintiff, an individual earning a reported annual salary of approximately $50,000.00. The court noted, however, that there was almost no evidence of record concerning the parties' respective financial circumstances. Since the first Report and Recommendation was issued the parties have done very little to remedy this void. Defendants offer only the following statement concerning the extent of their wealth:

> Should the Court wish to consider them, the 2007, 2008 and 2009 annual revenues of Psychiatric Solutions, Inc. can be found at http://www.faqs.org/sec-filings/100225/PSYCHIATRIC-SOLUTIONS-INC_10-K/#110. They range from approximately $1.4 billion to $1.8 billion. The annual revenues of Defendants Premier Behavioral Health and Gulf Coast Youth Academy are not publicly available. As set forth in the contemporaneously submitted Affidavit of Mark W. Peters, all fees incurred by Defendants in this action were billed to Defendant Psychiatric Solutions, Inc., which then sought and obtained reimbursement for those fees directly from Defendant Gulf Coast Youth Academy. Peters Affidavit at ¶ 3.

---

[12] Defendants also submit, without citation to authority or additional discussion, that considering only how much a prevailing corporate defendant earns in revenue when setting an award fee would "seem[ ] to violate the equal protection clause and is antithetical to the well-settled law that individuals and companies, regardless of size, are equal before the law." (doc. 349 at 7).

Doc. 349 at 5–6 n.4. As to Plaintiff, other than her testimony at the April 2011 evidentiary hearing that she earned approximately $50,000.00 annually, she has failed to produce any evidence concerning her wealth or, for that matter, Defendants' wealth.[13]

While the information regarding the parties' respective wealth is limited, it nevertheless is sufficient to show that a huge chasm exists between Plaintiff's resources and those of the corporate Defendants.[14] Given this gross disparity, the court concludes that a reduction from Defendants' request for $210,361.65 in § 448.104 attorneys' fees is appropriate. Thus the court proceeds to consideration of the amount of the deduction which the district court may order in the proper exercise of its discretion.

As an initial matter, the court addresses Plaintiff's proposal that a reasonable attorneys' fee would be $21,000.00, a figure she bases on a percentage of her annual salary. Although Plaintiff references Raytheon II in suggesting this reduction, the plaintiff's annual salary in that case had no bearing on the court's calculation of the fee award. Plaintiff mentions no other authority in support of her position. As Plaintiff has offered no binding, or even persuasive, legal or logical basis to calculate a fee award as a percentage of the paying party's annual salary, and as the court perceives none, it declines to recommend such an approach.

---

[13] Plaintiff does make the assertion that the "pertinent company" in the instant disparity-of-wealth analysis is UHS rather than PSI, PBS, and GCTC (doc. 339 at 5). Plaintiff has not provided any legal or evidentiary support for this contention, nor has she made any attempt to quantify UHS' actual value or wealth, either by its annual revenues or some other measure. In any event, the court notes that UHS has never been a named party in this action and reportedly only acquired the defendant companies in 2010—one year after summary judgment was entered and the underlying litigation was substantially concluded; also, Peters' billing records reflect that through December 2010 his firm's statements were sent to PSI, not UHS (*see, e.g.,* docs. 262, 266). In short, Plaintiff's having no demonstrated basis to do so and no basis being clear from the record, the court does not treat UHS as the relevant comparator. Nevertheless, it makes little difference here whether the comparator, when stood next to Plaintiff, has revenues of several billions annually or tens of billions annually. The difference between Plaintiff and either comparator is strikingly large.

[14] Even though the information concerning the parties' wealth is scant, it portrays a stark contrast, and the court concludes it is sufficient to allow consideration of the disparity-of-wealth factor in recommending the amount of the attorneys' fee to be awarded. *See* Blanco v. Transatlantic Bank, 2009 WL 2762361,*3 (S.D. Fla. 2009) (noting that while a more "elaborate explanation of [the plaintiff's] financial condition would [have been] useful, [his] response [was] not so inadequate that it precludes consideration of the parties' wealth disparity" and that the disparity was "patent from the record"); *see also* Bell v. Georgia Pacific Corp., 2005 WL 1618223, *1 (M.D. Fla. 2009) (denying request for attorneys' fees, in part on the ground that the disparity in wealth between the parties was "obviously gross"); and Raytheon II (accepting that the plaintiff was entitled to a disparity of wealth reduction on the record before it while refusing to further reduce or eliminate the plaintiff's obligation to pay attorneys' fees, in part based on lack of adequate documentation).

Defendants correctly note there is not a great deal of case law discussing how courts should handle disparity of wealth considerations and no required mathematical formulas they must apply (doc. 349 at 4). One case mentioned by both parties is <u>Blanco v. Transatlantic Bank</u>, 2009 WL 2762361 (S.D. Fla. 2009), which this court cited in its first Report and Recommendation when considering Plaintiff's liability for attorneys' fees. In <u>Blanco</u>, the prevailing defendant sought attorneys' fees of $192,066.40 under the FWA. The court considered several factors before deciding to limit the award to the post-summary judgment period.[15] The court also adjusted the request to account for certain billing improprieties, finally reaching an award in the amount of $12,962.80 (or approximately a 93% reduction of the requested amount).

Another case cited by both parties is <u>Raytheon II</u>. The <u>Raytheon II</u> court started its final determination of the fee award based on the defendant's proffer to accept the amount of $60,404.64 for its fees; Raytheon's prior request had been $134,232.54 but it voluntarily reduced that amount by 55% after the court announced it would be mindful of the disparity of wealth between the parties when setting the amount of the attorneys' fees to be awarded. <u>Raytheon</u>, 2010 WL 204487, *2. The reasoning behind Raytheon's offer to reduce its fees by 55% is not disclosed in the decision, but the court accepted that reduction before making deductions of $18,045.96 for excessive hourly rates or hours and improper documentation. *Id.*, *2–7. Ultimately, the court awarded a fee in the amount of $42,358.68, which amounted to a reduction of slightly more than 68% from Raytheon's earlier request of $134,232.54.

Plaintiff also cites <u>Durett v. Jenkins Brickyard, Inc.</u>, 678 F.2d 911 (11th Cir. 1982). According to Plaintiff, <u>Durett</u> states the premise that in "disparity-of-wealth cases in which a substantial defendant company wins fees against a plaintiff of limited means, the over-riding principle that trumps all other considerations is to sting the plaintiff enough to create a deterrent but

---

[15] These factors include:

      (1) whether the party's case was meritorious or frivolous;
      (2) the scope and history of the litigation, including whether the party continued to prosecute the action despite the presence of an efficient resolution;
      (3) the parties' wealth disparity;
      (4) whether an award of fees would frustrate the FWA's remedial purpose by deterring worthy claimants; and
      (5) whether the party acted in good or bad faith.

<u>Blanco</u>, 2009 WL 2762361, *2.

not to bankrupt her." (doc. 339 at 4). Defendants respond that <u>Durett</u> addressed the standard for assessing fees against a losing Title VII plaintiff that is set out in <u>Christiansburg Garment Co. v. EEOC</u>, 434 U.S. 412, 422, 98 S. Ct. 694, 54 L. Ed. 2d 648 (1978), but that standard does not apply to fee awards under § 448.104 (doc. 349 at 5 n.3).

In the instant case, as discussed above, this court concludes (and Plaintiff concedes) that the hourly rates and number of hours charged by Defendants in connection with the fees incurred in defending against Plaintiff's FWA claim are reasonable. Also, Defendants have already properly deducted fees that are non-reimbursable or fees that have already been reimbursed. Thus, unlike in <u>Blanco</u> and <u>Raytheon II</u>, this court need not make any additional deductions for excessive rates or hours or questionable billing.

Turning to consideration of the specific amount of the reduction based on the parties' disparity of wealth, this court first notes the <u>Durett</u> court's statement that "in determining the size of the award, the district court should ascertain whether, in light of the plaintiff's ability to pay, a reduced assessment would fulfill the deterrent purpose of § 706(k) [42 U.S.C. § 2000e-5(k)] without subjecting the plaintiff to financial ruin." <u>Durett</u>, 678 F.2d at 917. Defendants are correct in pointing out that the <u>Christiansburg</u> standard does not apply to fee awards under § 448.104. *See, e.g.*, <u>New World Communications of Tampa, Inc. v. Akre</u>, 866 So. 2d 1231, 1235–36 (Fla. 2d DCA 2003). Nevertheless, as both § 448.104 and § 706(k) authorize courts to grant attorneys' fees to the prevailing party,[16] it may be said that both statutes have a deterrent purpose and thus, at least in that respect, are analogous. Accordingly, the court concludes that <u>Durett</u>'s concern that an assessment of attorneys' fees under § 706(k) should be high enough to act as a deterrent to baseless suits but not so high as to be financially ruinous to a losing litigant should likewise apply to attorneys' fees assessed under § 448.104. *See* <u>Durett</u>, 678 F.2d at 917. With this principle in mind, the court must recognize that Defendants' suggested award of $157,771.24, based on a 25% reduction, would constitute a crushing financial obligation for Plaintiff and does not adequately take into

---

[16] In its entirety Fla. Stat. § 448.104 provides: "A court may award reasonable attorney's fees, court costs, and expenses to the prevailing party." 42 U.S.C. § 2000e-5(k) provides: "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person."

consideration the vast difference in the parties' wealth. Payment of such an award would be devastating to Plaintiff as an individual earner, while receipt of that amount—or even a somewhat higher or significantly lower one—would scarcely be felt by the corporate Defendants in this case. Thus the court considers a 25% reduction to be insufficient. The 55% reduction accepted by the court in <u>Raytheon II</u> would result here in an award of $94,662.74—an amount that would still constitute an excessively onerous burden for an individual earning only $50,000.00 annually. The court concludes that a fee award of $52,590.41 (excluding Defendants' request for fees from May 2012 through August 2012), which amounts to a 75% reduction in the amount sought of $210,361.65, adequately takes into account the immense disparity of wealth between the parties. Moreover, while far less than the $210,361.65 amount requested by Defendants (which amount would properly be assessed were gross disparity-of-wealth not an issue), this amount is sizable enough to serve as an effective deterrent against the filing of meritless actions while not frustrating the FWA's remedial purpose, because the specter of such an award would not deter *worthy* claimants. *See* <u>Raytheon I</u>, 2009 WL 5128040, *3. An award of $52,590.41 also is somewhat consistent with the amount of $46,279.63 that Plaintiff, when taking her financial situation into account, proposed during the parties' fee negotiations. In light of the circumstances of this case, therefore, this court concludes that an award of $52,590.41 constitutes a reasonable attorneys' fee under § 448.104. To this amount should be added Defendants' request for fees from May 2012 through August 2012—$5,342.29 likewise reduced by 75%—in the amount of $1335.57.[17] Thus this court recommends that Plaintiff be directed to pay Defendants a total of **$53,925.98** in attorneys' fees under § 448.104.

## 2. Fees Pursuant to Federal Rule of Civil Procedure 11

Peters' May 11, 2012, affidavit reflects that Defendants incurred $4,264.05 in attorneys' fees in responding to Plaintiff's unsuccessful Rule 11 motion (doc. 325 at 2). Peters further states, in

---

[17] Defendants seek to be reimbursed for time expended on this matter between May 11, 2012 (when Defendants filed their affidavits) and August 12, 2012 (when Defendants filed their reply). Plaintiff has not responded to this request. Although Defendants have not supplied an additional affidavit from an attorney familiar with hourly rates in this district, the affidavit from Boyd will suffice. As to the hours claimed, Peters' second affidavit (doc. 349-1, affidavit dated August 20, 2012) references billing records from May through August 2012 (docs. 336, 343, 348, 353), which the court has reviewed and concludes supports the request for $5,342.29. This amount should be reduced by 75%, resulting in an additional amount due to Defendants of $1,335.57.

part, that from the total amount of fees incurred ($289,597.76), Defendants deduct "[f]ees related to Plaintiff's Rule 11 Motion = $4,264.05" (*id.* at 2–3). That deduction, along with several others, results in "the total amount of fees for which Defendants seek recovery pursuant to Fla. Stat. 448.104 [being] $273,421.05" (*id.* at 3).[18] As noted above, Defendants later agreed to reduce that figure to $210,361.65, then proposed $157,771.24 if a 25% disparity-of-wealth reduction were made.       Responding, Johnson says he reads Peters' affidavit concerning the deduction of $4,264.05 to mean that Defendants abandon their claim for Rule 11 sanctions in that amount (doc. 339). According to Johnson, after preparing most of his response to Peters' and Boyd's fee affidavits he learned that Defendants interpreted Peters' affidavit as not expressing the intention to eliminate the $4,264.05 in fees on the Rule 11 motion. He asserts that Peters' affidavit contains "proof" of Defendants' intention to abandon the demand for fees, and he points to a series of e-mails in an attempt to support his position that "[t]he last our side knew, Defendants wanted $157,771.24 from Leslie Smith and the Rule 11 fees were out of the picture" (doc. 339 at 6). Also, according to Johnson,

> On the state of this record it is impossible to discern whether today's position is that Smith owes $157,771.24 and Johnson owes $4264.05 or that Smith owes $153,507.19 and Johnson owes $4264.05. If it is the latter, Johnson could be in a conflict-of-interest situation here in arguing that the total amount claimed, the $157,771.24, is attributable to Smith. Had that been raised before deadline, separate counsel could have been brought in. When the Affidavit eliminated all the Rule 11 fees, there was no point in going through them item-by-item to challenge excessive hours. If Rule 11 fees are allowed to be considered in this fee determination, additional time should be allowed to consult separate counsel and to challenge particular time entries.

Doc. 339 at 7–8.

Johnson's arguments are meritless. The e-mails Johnson has supplied show that prior to filing his response on July 12, 2012, Johnson was well aware that Defendants had no intention of abandoning or waiving their right to attorneys's fees on the Rule 11 motion. Johnson apparently first brought the issue up on July 11, 2012, in an e-mail to Peters in which he referred to the May 11, 2012, affidavit and asked, "Is it fair to say you are claiming no money on the Rule 11 motion?" (doc. 339-1 at 2). Peters responded that while he did not have his papers in front of him, based on

---

[18] As mentioned above, the actual figure should have been $269,157.00. *See* n.4, *supra*.

his recollection "it is <u>not</u> fair to say that defendants are waiving or not seeking fees related to the rule 11 motion" (*id.*) (emphasis added). Peters' partner, Andrew S. Naylor ("Naylor"), also reviewed Peters' affidavit and advised Johnson on July 12, 2012, that he saw nothing in it that set aside Defendants' demand for attorneys' fees related to the Rule 11 motion (*id.* at 1). Despite the responses from Peters and Naylor denying any intention to abandon the request for fees on the Rule 11 motion, Johnson proceeded to file a response with the court professing that his reading of Peters' affidavit should prevail. In this court's view, even generously construed, Johnson's reading is strained if not tortured. It also makes no sense: the district court's having awarded Defendants their attorneys' fees against Johnson personally for defending against Plaintiff's Rule 11 motion, it defies logic that, at this late date after a heated and hard-fought contest and for no apparent reason, Defendants would suddenly forgo them.

Johnson claims that "proof" to support his reading of Peters' May 11, 2012, affidavit can be found in the affidavit itself. The court need not dissect Peters' affidavit to evaluate Johnson's "proof" since a plain reading of the affidavit resolves the matter. As reflected previously in this Report and Recommendation, in Peters' affidavit he states that Defendants incurred a total of $289,597.76 in fees, from which they deducted fees solely related to Plaintiff's SOX claim ($11,574.25); fees related to litigation administration matters ($3,131.86); previously reimbursed fees arising from Plaintiff's earlier-imposed discovery sanctions ($1,470.60); and fees related to Plaintiff's Rule 11 motion ($4,264.05). That resulted in a new total calculated by Defendants of $273,421.05[19] which Defendants later lowered to $210,361.65 based on other considerations; they then offered to agree to a further reduced amount of $157,771.24 if a 25% disparity-of-wealth reduction were made). Contrary to Plaintiff's position, in the court's view it is not difficult to determine from Peters' May 11, 2012, affidavit the division of fees intended by Defendants, that is, that the § 448.104 fees owed by Plaintiff clearly are separate from and do not include the Rule 11 sanctions owed by Johnson. Thus the conflict of interest imagined by Johnson does not exist. Regardless, if Johnson had genuinely thought a conflict might exist it was up to him to so advise the court in making a timely request for additional time in which to respond to Defendants' affidavits. He did not do so. Nor need the court allow additional time for Johnson to "challenge particular

---

[19] *See* n.4, *supra* (correct figure is $269,157.00).

entries" in Defendants' attorney time records. Indeed, the court finds Johnson's statement that Peters' affidavit "eliminated all the Rule 11 fees" and thus "there was no point in going through them to item-by-item to challenge excessive hours (*id.* at 8) to be disingenuous, not to mention unsupported by the record. Johnson had ample time in which to review the records; moreover, he has advised the court—in responding to the fees request under § 448.104—that, "[a]fter studying the fee records," he found the time claimed and proposed hourly rates to be "reasonable enough" (doc. 339 at 2) (emphasis added). It is not credible that Johnson would have perused the extensive, numerous time records to assess them with respect to the § 448.104 fees yet neglected to consider the substantially fewer records and hours related to Defendants' defense of the Rule 11 motion. Furthermore, Johnson's e-mails to Peters acknowledge his responsibility to review the time sheets and suggest that he had done so (*see* doc. 339-1 at 4, 11, 12). Finally, and once again, if Johnson believed he needed additional time to study the fee records before filing his response, he should have timely informed the court, but he did not.

As noted, Peters' May 11, 2012, affidavit states that Defendants seek $4,264.05 from Johnson for attorneys' fees incurred in responding to Plaintiff's unsuccessful Rule 11 motion. Peters' August 20, 2012, affidavit indicates that an additional $1,074.15 is sought for fees incurred between May 11, 2012, and August 20, 2012 (doc. 349-1 at 2). In addition to Defendants' other time records on the Rule 11 motion, the court has reviewed the most recently submitted records (docs. 336, 343, 348, 353). The court is satisfied that the hourly rate and hours claimed are reasonable, based on its own experience, as well as Peters' May 11, 2012, and August 20, 2012, affidavits and Boyd's May 10, 2012, affidavit. Thus the court recommends that Johnson be directed to pay Defendants a total of **$5,338.20** (the sum of $4,264.05 and $1,074.15) in attorneys' fees in connection with Plaintiff's unsuccessful Rule 11 motion.

Accordingly, it is respectfully **RECOMMENDED** that:

1. Plaintiff be directed to pay Defendants a total of **$53,925.98** in attorneys' fees under Fla. Stat. § 448.104.

2. Johnson be directed to pay Defendants a total of **$5,338.20** in attorneys' fees in connection with Plaintiff's unsuccessful Fed. R. Civ. P. 11 motion.

3. Judgment be entered accordingly.

At Pensacola, Florida this 31<u>st</u> day of January 2013.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**